**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| SUSAN E. FOX, | * | CIVIL NO. 4:17-cv-00073-JAJ-SBJ |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | **REPORT AND** |
| NANCY A. BERRYHILL, | * | **RECOMMENDATION** |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**TABLE OF CONTENTS**

I. INTRODUCTION …………………………………………………………………………... 2

II. PROCEDURAL HISTORY …………………………………………………............... 3

III. REVIEW OF ADMINSTRATIVE RECORD ………………………………………….. 4

    A. Medical Records
    B. Reports Completed by Susan Fox and Her Daughter-in-Law
    C. Hearing Testimony of Susan Fox
    D. Testimony of Vocational Expert
    E. Report of Vocational Rehabilitation Counselor
    F. Decision of Administrative Law Judge

IV. JUDICIAL REVIEW OF DECISION ……………………………………………… 26

    A. Standard of Review
    B. Analysis of Fox's Arguments Before This Court

        1. Assessment of Past Relevant Work
        2. Application of Medical Vocational Guidelines Rule 202.06
        3. Assessment of Treating Physician's Opinion
        4. Assessment of Fox's Subjective Complaints and Testimony
        5. Error in Hypothetical Question

V. RECOMMENDATION …………………………………………………………………... 45

# I.  INTRODUCTION

Plaintiff Susan Fox ("Fox") seeks judicial review of the Social Security Commissioner's decision denying her Application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq.  Fox was found to suffer from the severe impairments of mild degenerative disc disease, irritable bowel syndrome, obesity, depression and anxiety.  It was determined Fox has the residual functional capacity to perform light work with certain exceptions and limitations.  Further, it was found that Fox is capable of performing past relevant work as a cleaner, and that such work does not require the performance of work- related activities precluded by her residual functional capacity.  Consequently, the Commissioner concluded Fox was not disabled for purposes of the Act.

Fox insists she is unable to engage in any substantial gainful activity due to her medically determinable severe impairments and, therefore, is disabled under the Act, and entitled to benefits accordingly.  She asserts three primary arguments before this Court: (1) the Administrative Law Judge erred by not classifying her prior work owning and operating a cleaning business as a composite job, and she cannot perform that past relevant work; (2) the Administrative Law Judge erred in not applying Medical Vocational Guidelines Rule 202.06 to her case, and finding her disabled; and (3) the Administrative Law Judge erred in discounting her treating physician's opinion limiting her to part-time work.  In her complaint, although not argued explicitly in her brief, Fox also asserts the Administrative Law Judge erred in assessing the credibility of her subjective complaints and testimony, and by posing a hypothetical question to the vocational expert which does not adequately describe her limitations.  Fox requests this Court reverse the decision of the Commissioner or, in the alternative, vacate the final decision of the Commissioner and remand this matter for further proceedings.

The case was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for

submission of a report and recommendation regarding a disposition. Dkt. 4.  As set forth below, it is recommended that the decision of the Commissioner be affirmed.

## II.  PROCEDURAL HISTORY

Fox applied for Disability Insurance Benefits on December 2, 2013, with an alleged onset date of October 31, 2012. Administrative Record (Dkt. 7) 265-271. The Social Security Administration denied her application for benefits initially on March 5, 2014, and upon reconsideration on May 28, 2014. *Id.* 143-172.  In both determinations, the Administration found Fox had the capacity to perform work similar to her past job as a delivery driver. *Id.*

Upon a timely request for a hearing, Fox's claims were heard before Administrative Law Judge ("ALJ") Eric S. Basse on August 10, 2015. *Id.* 94-142.  Fox was represented by counsel and testified on her own behalf. *Id.* 99-132, 137-141.  Vocational expert Melinda Stahr responded to hypotheticals presented by the ALJ and Fox's counsel. *Id.* 133-136.

ALJ Basse issued a written decision denying Fox's application for benefits on January 12, 2016. *Id.* 24-36.  The ALJ found Fox is capable of performing past relevant work as a cleaner. *Id.* 33.  Fox timely requested a review of the ALJ's decision, and the Appeals Council denied review on January 6, 2017. *Id.* 1-6.  Consequently, the decision of the ALJ stands as the final decision of the Commissioner. *Id.*

Fox filed her Complaint (Dkt. 1) before this Court on February 27, 2017.  She asserts that she testified to disabling limitations, but ALJ Basse rejected her testimony and failed to give good reasons for discounting her testimony. *Id.* ¶¶ 9-11.  She claims the ALJ's decision is not supported by substantial medical evidence, the ALJ improperly rejected her subjective allegations, and the hypothetical question posed to the vocational expert does not adequately describe her limitations. *Id.* ¶¶ 14-16.  Fox requests the final decision of the Commissioner be reversed or, alternatively, be vacated and remanded for further proceedings. *Id.* ¶ 18.  She also seeks reasonable attorney fees

and costs. *Id.* ¶¶ 19-20.

The Commissioner filed an answer on May 4, 2017 (Dkt. 6) with a copy of the Administrative Record (Dkt. 7). The Commissioner contends Fox has not shown "good cause" to warrant reversal under the Act, 42 U.S.C. § 405(g). Dkt. 6 ¶ 5.

Fox filed a brief (Dkt. 9) in support of her claims on July 6, 2017. The Commissioner submitted a responsive brief (Dkt. 10) on August 28, 2017. Fox filed a reply brief (Dkt. 11) on September 12, 2017.

The parties did not request oral argument and a hearing does not appear to be necessary. Thus, the matter is considered to be fully submitted for purposes of this report and recommendation.

### III.  REVIEW OF ADMINISTRATION RECORD

This Magistrate Judge has reviewed the entire Administrative Record ("A.R."), and summarizes certain portions as background for the specific issues presented by the parties as follows: (a) medical records, (b) reports completed by Fox and her daughter-in-law, (c) testimony of Fox at the hearing, (d) testimony of the vocational expert Melinda Stahr, (e) report by vocational rehabilitation counselor Paula Santagati, and (f) written decision of ALJ Basse.

#### A.  Medical Records

Fox saw Dr. Randoph Rough on January 5, 2012 for cardiac issues. A.R. 388. Dr. Rough noted Fox has a history of a racing heart, with heart rates up to 156 beats per minute, and has palpitations when she is anxious, but those are brief. *Id.* Dr. Rough also noted Fox smokes a pack of cigarettes a day and is unable to stop, her cholesterol was recently 247, and she denies chest pains or significant dyspnea symptoms. *Id.* Dr. Rough's impressions were that Fox has hypertension, mild hyperlipidemia, obesity, a racing heart, anxiety, a normal stress cardiolite, positive family history for myocardial infarction and continued nicotine use. *Id.* 389-390. Dr.

Rough encouraged weight reduction and follow-up in one year. *Id.* 390.

Fox saw Dr. Kim Countryman on October 25, 2012, complaining of irritable bowel syndrome. *Id.* 398. Fox reported having significant lower abdominal pain with constipation and diarrhea, with the pain starting the moment she walked into work at Walmart. *Id.* Dr. Countryman had a long discussion with Fox concerning her medical issues, and indicated Fox's issues "are directly tied to her severe anxiety regarding her job." *Id.* 399. Dr. Countryman told Fox "she needed to make a decision regarding her job" and "recommended [she] turn in her resignation and get a non-irritating, non-anxiety producing part-time job" with low volume and stress. *Id.* Dr. Countryman's assessment was that Fox suffered from anxiety, irritable bowel syndrome and depression. *Id.* Dr. Countryman issued a "to whom it may concern" note which stated:

> Ms Susan Fox can not work overnight's, must work low stress hours at work and must only work 8 hour days / 5 day work week. Must have the days off be consecutive.

*Id.* 400.

Dr. Rough saw Fox for a recheck on her heart issues on April 18, 2013. *Id.* 391. Fox reported she had not had any recent fast heart beats, but does have an occasional skipping of her heart and palpitations. *Id.* Dr. Rough indicated this should not require any specific change in therapy. *Id.* Dr. Rough found Fox's blood pressure was controlled but she was significantly obese at 255 pounds and encouraged her to lose weight, and noted Fox continues to smoke a pack of cigarettes a day. *Id.* Dr. Rough's impressions were hypertension, racing heart rate, controlled with a calcium channel blocker, palpitations correlating with simple ectopy, continued nicotine abuse, mild hyperlipidemia, abnormal stress cardiolite, and a positive family history for myocardial infarction. *Id.* 393. Dr. Rough encouraged weight reduction and nicotine cessation. *Id.*

Fox met with Physician Assistant Michael Barger on October 30, 2013, to establish care with the Family Health Center. *Id.* 459. Fox reported having chronic diarrhea and then

constipation, as well as a long history of depression and bad anxiety for which she was taking medications. *Id.*

Nurse Practitioner Ranae Roberts met with Fox on November 15, 2013, for a psychiatric evaluation. *Id.* 453.  Fox reported her mood as being nervous and edgy, grooming is difficult, and it takes an enormous effort for her to get out of the house or take a shower. *Id.* 454.  Fox felt she was becoming homebound because of her mood and her chronic diarrhea. *Id.*  She reported feeling overwhelmed and pressured with life, with finances being a big stress because she had to quit her job, she has had anxiety since she was 20 years old, and she has suffered from depression over the past several years. *Id.*  Fox felt her body was breaking down as she was unable to go out of the house due to increased bowel movements, cramping and diarrhea. *Id.* 455.  NP Roberts noted a past psychiatric history which included Fox receiving therapy at the age of 28 for anxiety, seeing therapists and psychiatric providers on and off since her late 20s, and having previous diagnoses of anxiety, agoraphobia, OCD and possible major depressive disorder. *Id.*  NP Roberts' assessment was anxiety disorder, continuous tobacco dependence and moderate recurrent major depression. *Id.* 456.  The plan was to resume Fox on Cymbalta and weaning off of Zoloft, with Fox to return to the clinic in one to two weeks or sooner if needed. *Id.* 457.

Fox visited NP Roberts again on November 25, 2013, for an interval exam. *Id.* 449-450.  Fox reported overall feeling better, but also noted moderate to severe agoraphobic features. *Id.* 450.  She indicated it took considerable effort to leave the house, and reported not leaving the house until 4:00 p.m. to run errands the day before the appointment because she was stressed about it all day. *Id.* 450-451.  Fox indicated she had less diarrhea and less back pain. *Id.* 451.  She also indicated a lack of motivation for self-care and housecleaning, but is noted as improving. *Id.* 451-452.  NP Roberts' assessment was moderate recurrent major depression and agoraphobia. *Id.* 451.  Fox was directed to return to the clinic in two to three weeks or sooner if needed. *Id.* 452.

NP Roberts saw Fox again on December 27, 2013. *Id.* 444.  Fox reported doing better in some areas, and the same in other areas. *Id.* 445.  She indicated her mood was better, she was not so down lately, but does have bouts of not showering for nearly two weeks, and had not taken her garbage out for a month. *Id.*  She reported difficulties with motivation, in particular with housekeeping. *Id.*  She was hesitant to increase her medications, but knew it would help. *Id.* 446.  Her anxiety was not as bad as it had been, however, she still had panic feelings at times. *Id.*  The assessment was anxiety disorder, tobacco dependence, moderate recurrent major depression and agoraphobia. *Id.* 446-447.  NP Roberts adjusted medications and directed Fox to return with an update. *Id.* 447.

On February 18, 2014, Fox saw Licensed Social Worker Kelli Foltz-Daniels for therapy. *Id.* 419.  Fox reported her depression and anxiety had taken a turn for the worse over the past few months due to a diagnosis of acute colitis and being advised to resign from her job. *Id.*  Fox indicated she resigned from her job and started looking for less stressful work, but had not been able to find anything, and her unemployment benefits were running out. *Id.*  She expressed concern about losing her home, indicated her mother had recently died, and her car needed repairs. *Id.*  She had very low motivation for most things, including self-care, and had allowed her home to become in bad condition. *Id.* 419-420.  She also expressed a decreased ability to concentrate, but did have some ability to obtain enjoyment from television and the internet. *Id.* 420.  She struggled with sleep, but denied having thoughts of self-harm or suicide, or of harming anyone else. *Id.*  It was recommended that Fox start individual psychotherapy, continue to work with her medical teams to address her health issues, and follow-up with community resources. *Id.* 423.  Diagnosis was depressive disorder, anxiety disorder and agoraphobia. *Id.*

Fox had another interval exam with NP Roberts on February 26, 2014. *Id.* 434.  She reported her mood as "marginally better" but still had a lack of motivation, sadness and numerous

stressors in her life. *Id.* 436.  Fox also reported having irritable bowel syndrome symptoms, but at the time more constipation and diarrhea, and was uncomfortable leaving the house. *Id.*  The assessment was depressive disorder, anxiety disorder, agoraphobia and hoarding disorder behavior. *Id.* 437.  The plan was to increase dosage of Wellbutrin and continue on Cymbalta. *Id.*  Fox was to return in five to six weeks or sooner if needed and follow-up with her primary care physician concerning physical health issues. *Id.* 438.

On March 19, 2014, Fox saw Licensed Social Worker Teresa Weeks for individual therapy. *Id.* 430.  Fox presented very depressed, with low energy and lack of motivation to change. *Id.*  Symptoms were noted as anxiety and depression manifested by hoarding and agoraphobia. *Id.*  Fox admitted to a hoarding problem, but did not know where to start in cleaning it up, and expressed difficulty showering even once a week and not doing dishes in over two months. *Id.*  Her goals were to begin journaling, and getting up, showering and dressed prior to the next session. *Id.*  Diagnosis was noted as agoraphobia, hoarding disorder behavior, and moderate recurrent major depression. *Id.*

Fox saw NP Roberts on May 12, 2014, for another interval exam. *Id.* 426.  She was feeling better overall with increased motivation, but was experiencing a lack of initiation. *Id.* 427.  She wanted to plant a garden and start quilting again, but it was hard for her to follow through. *Id.*  She was taking her medication as prescribed, and reported positive benefits with no negative mental side effects. *Id.* 428.  NP Roberts noted a diagnosis of agoraphobia, anxiety disorder, depressive disorder, hoarding disorder behavior and tobacco dependence. *Id.*  Fox's medications were adjusted, and she was directed to continue with individual therapy and return in two to three months or sooner if needed. *Id.* 429.

Fox returned to see NP Roberts on August 28, 2014, and reported she was feeling depressed and anxious, and experiencing low motivation. *Id.* 490-491.  Her house needed work, the garbage

needed to be taken out and she had hoarding behaviors at times. *Id.* 491.   NP Roberts adjusted medications, and indicated Fox should return in one month and initiate therapy appointments as soon as possible. *Id.* 493.

On November 4, 2014, Fox saw Dr. Dana Danley for a comprehensive physical examination. *Id.* 484.   Among other things, Fox reported having chronic diarrhea and mild urinary incontinence. *Id.*   She indicated having difficulty coming to the appointment due to agoraphobia, and was meeting with a counselor on a regular basis. *Id.*   She noted having depression in the past, but felt it was worse due to her lack of motivation, hygiene and cleanliness at home. *Id*

Fox returned to NP Roberts on January 2, 2015, for medication management and reported having extreme agoraphobia, not leaving the house for weeks, and not showering for six weeks except bathing before her appointment. *Id.* 479-480.   She complained of decreased motivation. *Id.* 480.   Coping techniques, anxiety reducing behaviors, and depression relief techniques were discussed with and understood by Fox. *Id.* 481.   The diagnosis noted was agoraphobia, anxiety disorder, hoarding disorder behavior and moderate recurrent major depression. *Id.*   Fox was to continue with Cymbalta and consider trying Wellbutrin or other medications, and returning in two to three months or sooner if needed. *Id.* 482.   NP Roberts strongly recommended individual therapy. *Id.*

Fox worked with Dawn Larson, Rehabilitation Coordinator, with Mainstream Living, Inc. from May 25, 2015 through June 30, 2015. *Id.* 502-504.   The objectives were to learn new coping skills by December 31, 2015, and consisted of the staff meeting with Fox in her home to work on those matters. *Id.*

Fox saw LPN Ann Ries on June 25, 2015, for medication follow-up. *Id.* 473-474.   It was noted Fox had not been seen at the clinic since the previous January, and reported things had been "better and worse." *Id.* 474.   Fox had stopped taking Cymbalta, and felt her emotions had come

back, and she had a clear mind, and had started writing again. *Id.*  She was enjoying writing,
spending time with her cats, and being on Facebook to chat with friends. *Id.*  She reported taking
medications for anxiety approximately three times a week, and "having emotions since her brain
function is back." *Id.*  She indicated she looks forward to cleaning her house, and is doing one box
at a time, and wants to refrain from further psychotropic medication. *Id.*  LPN Ries noted Fox's
mood would be investigated at her next appointment, she was to continue with individual therapy,
and return to the clinic in two to three months or sooner if needed. *Id.* 474-475.

Fox met with Physical Therapist John Urban on August 12, 2015, to treat low back pain.
*Id.* 505-506.  Fox indicated she had suffered chronic back pain beginning in October 2014. *Id.* 506.
She reported her back hurts with walking, prolonged standing and bending forward, and she is
unable to lie flat on her back due to pain, but she is able to completely relieve her symptoms by
sitting in a recliner. *Id.*  The plan involved treatment intervention focusing on postural reeducation
and lower extremity strength, modalities and manual therapy as needed. *Id.*

### B.  Reports Completed by Susan Fox and Her Daughter-in-Law

Fox completed a chest pain questionnaire on February 10, 2014. A.R. 303-304.  She
reported having "no chest pain" but her heart can speed up at times, however, medications help
keep it under control. *Id.* 303.  She indicated stress makes her heart speed up and skip beats. *Id.*
She has lower back pain but can walk "quite a distance" briskly, and at a normal pace. *Id.* 304.
Sitting for a few moments can ease the lower back pain. *Id.*  She can lift and carry 30 pounds,
sometimes 40 pounds but not far. *Id.*  She has strong lower intestinal cramps on an almost daily
basis. *Id.*

Fox also completed a function report dated February 10, 2014. *Id.* 307-314.  She reported
being diagnosed in 2013 with acute colitis and irritable bowel. *Id.* 307.  She has had diarrhea on a
daily basis, which is uncontrollable, especially after she eats. *Id.*  She has severe stomach cramps

each day, and not much energy. *Id.*  Due to severe depression and frequent anxiety and panic attacks, she has trouble leaving the house. *Id.*  She also has trouble concentrating, cleaning her house and taking proper care of herself. *Id.*

Fox further reported trouble waking up in the morning. *Id.* 308.  Most of her daily activities are looking at Facebook and watching T.V. *Id.*  She only leaves the house when she needs to pick up medications, attend appointments at the hospital or clinic, or pick up cigarettes or groceries. *Id.*  She does not visit friends or family, and does very little housework or laundry. *Id.*  Prior to her illnesses she could do anything she wanted to, including work, visiting with friends, taking care of herself and doing housework. *Id.*  She has anxiety and trouble sleeping when she knows she has to leave the house the next day. *Id.*

According to Fox, she can dress herself but no longer takes daily showers or washes her hair. *Id.*  She can feed herself, but does not do much laundry. *Id.*  Although she is able to take care of her personal needs and grooming, she does not do so because she does not care anymore. *Id.* 309.  She prepares frozen dinners, but does not use an oven or stove. *Id.*  She does not cook often as she does not feel like eating because it sets off her intestinal issues. *Id.*  She washes her laundry when she runs out of clean clothes, but usually wears the same clothes, and rarely cleans. *Id.*  Since no one comes to see her, she does not care about the mess in her house. *Id.*  She does drive a car and can go out alone, but she will go outside only when she has to go somewhere, otherwise, she stays inside. *Id.* 310.  She will shop for groceries and cigarettes in stores one time a week, but does so quickly so she can get home. *Id.*

Fox is able to take care of her bills and money. *Id.*  She does not have much in-person contact with other people, and mostly communicates through Facebook. *Id.* 311.  Except for medical staff, she does not interact much with others. *Id.*  Fox explained that most of her family and friends do not understand what she is going through. *Id.* 312.  Prior to her illnesses she went

anywhere she wanted, and did everything she desired to do. *Id.*   Fox indicated she hurts in the lower back if she walks more than a short distance, or if she stands very long. *Id.*   She can walk around in the hospital, but may need to rest for a period of time due to pain in her back. *Id.*

Fox follows written instructions "okay" and spoken instructions well if she does not get sidetracked. *Id.*   She explained she does not handle stress well due to her irritable bowel syndrome and panic attacks, and changes in routine are hard for her. *Id.* 313.   She has phobias in the form of avoiding people, and is easily ashamed. *Id.*   Due to the onset of diarrhea, she tries not to get stressed, although she used to be able to handle stress. *Id.*

Fox also completed a Work History Report dated February 10, 2014. *Id.* 315-324.   Among other jobs, Fox indicated she was an owner/operator of a home cleaning service from 1990 to approximately 2010. *Id.* 316, 320.   Asked to describe this job, she responded: "advertise, maintain cleaning inventory & vacuums & equipment. Supervised up to 2 employees (part time), but worked alone most days cleaning private homes." *Id.* 320.   She further indicated she used an upright vacuum and handheld vacuum, and the only technical skills or knowledge needed was her cleaning experience. *Id.*   She relied on assistance to prepare her financial information and reports. *Id.*   Fox estimated she walked 50 minutes and stood 40-45 minutes each day on this job. *Id.*   She constantly stooped, occasionally kneeled, almost never crouched, occasionally crawled, and reached frequently. *Id.*   The heaviest object she handled was a lightweight upright vacuum, and only had to handle small objects when dusting. *Id.*   The heaviest weight she lifted was 10 pounds and she never had to move furniture. *Id.*   She would carry equipment and supplies to and from her car, and up and down stairs. *Id.*   She explained she supervised two other people in this job for "maybe a year" and did not spend much time supervising them "except for checking their work quality." *Id.*

Fox's daughter-in-law, Heather, completed a third-party function report dated February 5, 2014. *Id.* 292-301.   Heather reported that Fox is depressed, has anxiety, exhaustion and bathroom

issues from her medications, and sleeps irregularly due to her illnesses. *Id.* 294-295.  According to Heather, prior to her illness Fox was able to work five days a week, and visit her family eight or more times a year. *Id.* 295.  Now Fox constantly needs to be close to home to use the toilet. *Id.* Heather indicated Fox cannot "keep up with bills due to Walmart firing her for her illnesses," but she does shop for groceries, drives, and goes outside 10 to 12 times per year. *Id.* 296.  Heather further reported Fox can prepare her own meals and do some laundry and cleaning, although chores are slowly spread out through the week. *Id.* 297.  Heather noted Fox needs help cleaning because she becomes exhausted and feels sick. *Id.*  Fox's hobbies include reading. *Id.* 298.  Heather indicated Fox is a recluse, her only granddaughter rarely sees her, and her family misses her. *Id.* 299.  As described by Heather, Fox has difficulty following through with her promises to visit, she cries a lot and has a fear of leaving her home. *Id.* 299-300.

### C.  Hearing Testimony of Susan Fox

Fox presented testimony to the ALJ on August 10, 2015. A.R. 99-132, 137-138.  She was born April 22, 1952, graduated from high school, and received a diploma. *Id.* 99.  Fox did not pursue education beyond high school except for what she called "self-education." *Id.*  She is 5'1½" tall, and weighs approximately 266 pounds. *Id.* 112.

According to Fox, she has not worked since she became disabled on October 31, 2012, when her doctor told her she needed to quit working at Walmart. *Id.* 99-100.  Fox had worked as a sales associate after starting as an inventory control specialist. *Id.* 100.  She stocked shelves, worked in the pharmacy, set-up, assembled and dissembled displays, moved pallets of merchandise on the floor, picked up merchandise to be brought to the floor, and cashiered. *Id.* 101.

Previously, Fox had delivered pizza, and acted as a shift manager on some days, before accepting the position at Walmart which had better wages and benefits. *Id.* 107-108.  Fox also had her own business cleaning houses which started in 1991 and ended in December 2010. *Id.* 129.

She worked full time doing "everything" herself except "at one point" she had two part-time employees working for her. *Id.*

Fox also earned income as a contract writer of Harlequin Romance novels primarily in the early 2000s. *Id.* 101-103. Twenty five of her novels were published, some of which are still being published in foreign markets. *Id.* 101. She considered it a "great moneymaker" for her because she could set her own schedule and spend time with her family. *Id.* 102. It would take her about three to four months to write a novel and generated up to $18,000 or $20,000 a year. *Id.* 102-103. Her first book was published in 1986, and the last book was published in 2007. *Id.* 130.

During the hearing, Fox discussed the health problems which interfere with her functioning, including irritable bowel syndrome and acute colitis. *Id.* 103. While at Walmart, she had to take leaves of absence because of flares of diarrhea. *Id.* 104, 122. She tried medications but then would have difficulty with constipation. *Id.* 104. The doctor attempted to adjust her medications, but could not get the correct balance. *Id.* 104-105. Fox testified this condition "gets better" but she still has flares. *Id.* 105. She noted that during the weekend before the hearing she had "tremendous abdominal pain and a lot of diarrhea." *Id.* Fox believes if she had a job she would be in the bathroom "off and on" throughout the day even with using pads and liners. *Id.* 105-106. She estimates she can be in the bathroom for up to an hour and a half, several times a day. *Id.* 106-107.

Fox enjoyed her work at Walmart, but quit due to the irritable bowel syndrome. *Id.* 108. On the days she had bad symptoms, Fox would spend up to an hour and a half in the bathroom. *Id.* 109. She would take leaves of absence to deal with the symptoms, and adjust her behaviors in other ways to try to control the condition. *Id.* Fox believes that if she were to be rehired at Walmart she probably would still have similar problems, and could not be reliable. *Id.* 110-111.

Fox indicated the stress at her job at Walmart exacerbated her irritable bowel syndrome

and diarrhea. *Id.* 116-117.  After she stopped working there, it took a while for her "body to calm down" but it did get better. *Id.* 117.  She became careful not to eat ahead of time if she needed to go out. *Id.*  Then three of her four pets died over the course of 18 months, followed by her mother passing away, which led to her "depression, anxiety, everything" becoming worse. *Id.* 117-118.  Even though she is removed from the stress of her previous employment, Fox indicated she still has terrible cramping once a week. *Id.* 122.

Fox also testified she has panic attacks approximately four times a week which she describes as being "in an anxiety state" the whole day. *Id.* 124.  She will feel anxious and sick, which can send her running to the bathroom, or cause cramping. *Id.*  She believes she has her "emotions back after being off the Cymbalta" and can have "a weepie day" followed by being "furious about something" the next day. *Id.* 124-125.

According to Fox, she is uncomfortable around large groups of people. *Id.* 118.  She spends a lot of time on the internet, and corresponds with her Facebook friends. *Id.* 119.  She was asked to write more novels but felt she "couldn't do it" especially when she was taking antidepressants. *Id.*  She has not been able to find an "antidepressant that works so [she] can fully function." *Id.* 119-120.

Fox also testified she cannot stand for very long, and has lower back pain. *Id.* 120.  She has to move, but then has pain down into her hips and her legs start shaking. *Id.*  She noted that an x-ray of her back showed it was normal, but it has "been downhill from there" and she cannot clean her house. *Id.*  Doctors did not prescribe a procedure for her back and initially told her "to just rest [her] back." *Id.* 120, 137.  According to Fox, "sometimes the only thing to get rid of the pain is to lay down." *Id.* 123.

Fox has difficulty doing her chores at home, especially if she has to stand, and does not have anyone who helps her. *Id.* 125.  She testified she cannot vacuum, and was only able to do so

once or twice the past year while sitting in a rolling chair. *Id.* 125-126.  It is difficult for her to stand at the counter to do dishes and carry things up and down the stairs to do laundry. *Id.* 126. She can no longer mow her yard. *Id.* 138.  While her lower back causes those difficulties, she is also "just overwhelmed by how much stuff there is to do that it's very hard to make a start." *Id.* 126.  In addition to having trouble keeping her home clean, she has difficulty with showering and has gone up to three months without doing so due to back pain and dizziness. *Id.* 126-128.

Currently Fox meets with staff from Mainstream Living to help her get back on her feet, and her life back together. *Id.* 112.  Although available, she does not have someone help her with self-care, like bathing, or cleaning, laundry, chores or shopping. *Id.*  She lives by herself, and drove herself to the hearing. *Id.* 112-113.  She does not go out very often in public, does not go to the mall, and does not shop for clothes. *Id.* 113-114.  If she goes out in public, it usually has to be some place she can go in and out quickly. *Id.* 114.

Fox planned to start treatment with a physical therapist the day after the hearing to address the problems with her back. *Id.* 137.  She understands "it's not a huge, serious thing" which requires surgery but believes she "should be able to do more than [she is] doing." *Id.* 138.  Fox says she spends most of the day sitting, but makes herself get up and walk around the house. *Id.*

### D.  Testimony of Vocational Expert

Vocational expert (VE), Melinda Stahr, testified at the hearing on August 10, 2015. A.R. 133-136.  The ALJ presented an initial hypothetical as to whether past work could be performed by an individual of Fox's age, education and past work, with the following limitations:

> Let's put medium work as that term is defined in the DOT. Frequent climbing ramps and stairs, frequent balance, stooping, kneel, crouch, craw. No, well occasional ladders, ropes and scaffolds. No concentrated exposure to hazardous conditions. Simple routine tasks. No interaction with the public. Interaction with supervisors is I guess fine. No limitation in interaction with supervisors. Coworkers, small groups, occasional interaction with coworkers, small groups. Oh, probably no work at a production rate pace, production line pace.

*Id.* 133.   In the opinion of the VE, based on her experience as a vocational counselor and in the field of job placement, with those conditions an "individual would be able to do the cleaning work. And as performed – no. That's it. Cleaner." *Id.*   The ALJ modified the hypothetical to take the same individual "and put them at light work as that term is defined in the DOT and regulations." *Id.* 134.   The VE responded "[t]hen the cleaner remains." *Id.*

The ALJ modified the hypothetical again to provide for "unscheduled absences from work two days a month." *Id.*   In the opinion of VE Stahr, such an "individual would not be competitively employable." *Id.*   The ALJ then asked the VE to assume the individual "would be off task during the day for bathroom breaks or other – just put off task 20 percent of the work day, not doing the job during the day. Unscheduled, of course." *Id.* 134-135.   The VE testified again that the "individual would not be competitively employable." *Id.* 135.   Going back to the first hypothetical, the ALJ inquired as to whether the individual could perform past work if limited to sedentary work. *Id.*   The VE responded "no." *Id.*

In response to questions from Fox's attorney, VE Stahr testified "that employers will tolerate up to 20 percent of the work day off task." *Id.* 136.   The VE further testified "that employers will tolerate no more than two days missed per month." *Id.*

### E.  Report of Vocational Rehabilitation Counselor

At the request of Fox's attorney, Vocational Rehabilitation Counselor and Employment Specialist Paula Santagati reviewed Fox's records to provide a vocational opinion as to whether her past work as an operator/owner of her cleaning business was misclassified as Housekeeper Cleaner (DOT 323.687-014). *Id.* 378.   Ms. Santagati also examined "whether the job can be sustained as actually performed, given [Fox's] RFC with restriction to simple, repetitive tasks and restriction to no interaction with the public." *Id.*   In her report dated August 20, 2015, Ms. Santagati

opined that "Fox's past work as the Owner/Operator of her own cleaning service was misclassified and meets the definition of a composite job." *Id.*  She explained as follows:

> Based on Ms. Fox's description of the entirety of the tasks involved in the job, especially as she owned her own business, this was a composite job. The mental limitations of this composite job could not be performed with the restriction to simple, repetitive tasks, or with a restriction to no interaction with the public. The job also exceeds exertional limitations.
>
> Ms. Fox was the operator of her own cleaning service. In that job she had to advertise, maintain her cleaning inventory, vacuums, and equipment. She was also required to stoop constantly, kneel occasionally, crawl occasionally, and frequently reach. This job was a composite job, combining tasks involved with cleaning positions, in addition to advertising positions as she had to promote her business. Furthermore, maintaining her inventory was an additional task, making this akin to the position of supervisor, housecleaner, DOT 323.137-010, but with additional duties such as those of a sales-service promoter, DOT 165.167-010. Ms. Fox's mental residual functioning capacity prevents her from performing the supervisory or self-promotion tasks required of her in this past work, hence she cannot perform this past work.
>
> Even if the job was classified as housekeeper cleaner, that job is described in the DOT is not complete as actually performed because it requires the performance of duties associated with CLEANER (any industry) 1 Master Title, which includes work in public facilities and jobs that exceed the RFC in terms of strength and in terms of interaction with others in public locations.

*Id.* (internal citations to exhibits omitted).

### F.  Decision of Administrative Law Judge

A written decision was issued by ALJ Eric S. Basse on January 12, 2016, concluding Fox was not disabled under the Social Security Act from October 31, 2012, the onset date alleged by Fox in her December 2, 2013 application for benefits. A.R. 24-36.  In his decision, ALJ Basse set forth and followed the five-step sequential evaluation process established by the Social Security Administration for determining whether an individual is disabled. *Id.*[1]

---

[1] *See* 20 C.F.R. § 404.1520; *Cuthrell v. Astrue*, 702 F.3d 1114, 1116-17 (8th Cir. 2013); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Jimmerson v. Astrue*, 717 F.Supp.2d 840, 856 (S.D. Iowa 2010).

It was first found Fox has not engaged in substantial gainful activity since October 31, 2012, the alleged onset date. *Id.* 26. Second, ALJ Basse found Fox has the following severe impairments: mild degenerative disc disease, irritable bowel syndrome, obesity, depression and anxiety. *Id.* At step three, it was determined Fox does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the regulations. *Id.*

Although the first three steps are not at issue for this judicial review, the findings made by the ALJ at step three are instructive. ALJ Basse found Fox has moderate difficulties with regard to activities of daily living, social functioning and concentration, persistence or pace. *Id.* 27. ALJ Basse explained as follows:

> In activities of daily living, the claimant has moderate but not greater restriction. The claimant was able to prepare her own meals of frozen dinners and ready to eat food. The claimant was able to do laundry when she ran out of clothes. She was able to drive, and shopped for groceries once a week. The claimant reported she could lift and carry 30 pounds, sometimes 40, as long as it was not far. She was able to walk quite far, between a parking lot and all through Broadlawns Hospital. The claimant spent a lot of time on the internet. The claimant received a ride from Mainstream Living to a medical appointment on June 25, 2015 and received counseling on several days in June 2015.

> In social functioning, the claimant has moderate but not greater difficulties. The claimant alleged she was hardly involved with anyone in person. The claimant did not feel she did well in handling stress. She mostly communicated to others through Facebook or on the phone. The claimant did not believe her friends and family understood what she was going through. However, she stated she got along with authority figures very well. She had never been fired or laid off from a job because of problems getting along with other people. The claimant had two female friends with whom she was close. Treating and evaluating medical individuals have not persistently indicated the claimant difficult to interact with.

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant did not feel she finished what she started. However, she admitted she could pay attention a long time. She was able to follow written instructions "okay." She could follow spoken instructions unless it was a long list and if she did not get sidetracked. The ability to drive suggests a good ability to attend and concentrate. An individual has to be aware of, and respond

appropriately to, changing traffic situations, traffic signs, and traffic signals, at times instantaneously. The claimant was able to attend to, and respond appropriately to questions asked at the hearing, providing detailed information from memory.

*Id.* (internal citations to exhibits omitted).

At step four, ALJ Basse determined the residual functional capacity of Fox as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can occasionally climb ladders, ropes and scaffolds. She should have no concentrated exposure to hazardous conditions. She is limited to simple, routine tasks. There should be no interaction with the public. She may occasionally interact with small groups of coworkers. There are no limitations with respect to interacting with supervisors. The work should not involve a production line pace.

*Id.* 28.  This determination is based upon an apparent thorough consideration and analysis of the entire record.

The ALJ first noted Fox's subjective descriptions of her symptoms and limitations associated with her various physical and mental impairments. *Id.*  It was found that Fox's impairments could reasonably be expected to cause the alleged symptoms but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* 29.  In doing so, ALJ Basse assessed objective medical and other evidence in the record with Fox's own statements as to her daily activities and abilities, beginning as follows:

The claimant received unemployment compensation after the alleged onset of disability date. An individual applying for, and receiving unemployment compensation must ordinarily affirm to the state that he or she is ready, willing and available to work. The application for, and receipt of unemployment benefits is an inconsistency which significantly undermines the undersigned's willingness to credit the claimant's allegations concerning the existence, persistence and intensity of disabling symptoms and functional limitations. However, in this case the receipt of unemployment benefits is only one factor among many that are considered when evaluating the claimant's credibility.

*Id.* 30 (internal citations omitted).   The ALJ then turned to the medical records, including

assessment of the opinions of Fox's treating doctor:

> There is no supraventricular tachycardia impairment established by medically determinable signs and findings with more than minimal effect on the claimant's ability to engage in basic work activities. Her condition was described as controlled with medication (Exhibits 4A, 1F).
>
> The claimant was advised by her treating source on October 25, 2012 that her medical issues of irritable bowel syndrome and lower abdominal pain with constipation and diarrhea were directly tied to her severe anxiety regarding her job. She was recommended to turn in her resignation and get a non-irritating, non-anxiety producing part-time job with low-volume and stress (Exhibit 2F, page 6). The undersigned gives the opinions of the claimant's treating doctor varying degrees of weight. The undersigned agrees that the claimant can no longer perform her past relevant work as a "sales associate"/stocker, based on the testimony of the vocational expert at the hearing. The undersigned agrees with the opinion of the claimant's treating doctor that she retained a functional capability sufficient to perform other work and gives that part of the doctor's opinion a good deal of weight. The undersigned agrees with the treating doctor that the cause and effect of the claimant's colitis/intestinal related problems appears to be the need to avoid stress. That opinion is consistent with other evidence and has been given a good deal of weight. The opinion of the doctor that the claimant is limited to only part-time work is not given weight. That opinion is not well supported by medically determinable signs and findings. That opinion is not consistent with other evidence and inconsistencies in the record as a whole which establish a greater functional capability. The opinion relies in part upon the claimant's allegations concerning the existence, persistence and intensity of symptoms and functional limitations, which the record as a whole and inconsistencies establish are not entitled to full weight or credibility. The opinion also calls for vocational expertise, which there is no indication the doctor has. That opinion is not consistent with the doctor's subsequent opinion, which indicated the claimant could only work eight-hour days, and a five-day workweek. She was to avoid overnight work and should have low stress. Days off should be consecutive (Exhibit 2F, page 7). The doctor's opinion that the claimant was capable of other full-time work is consistent with other evidence in the record as a whole, provides a better explanation for the claimant's functioning in light of the evidence in the record, and has been given great weight.

*Id*. ALJ Basse further addressed Fox's irritable bowel syndrome, explaining that

> [t]here is no incontinence impairment established by medically determinable signs and findings with more than a minimal effect on the claimant's ability to engage in basic work activities. The record does not establish persistent use of a powerful anti diarrheal drug such as Lomotil or other incontinence medication which was ineffective. In January 2015 the claimant alleged to a nurse practitioner that she had bouts of constipation and diarrhea (Exhibit 6F, p. 10) but later that day denied

gastrointestinal symptoms to an examining doctor (Exhibit 6F, p. 6). Her inconsistent responses on the same day and the lack of persistent search for treatment during the time in question erodes the credibility of her allegations (Exhibit 4A) and establishes the more minimal, tolerable and nonsevere nature of her alleged problem.

*Id.* 31. Similarly, after reviewing the records in regard to Fox's depression and anxiety, ALJ Basse

found her mental impairments are not of a severity to preclude work:

On November 25, 2013, the claimant's mental status examination was intact/negative/normal. The claimant seemed neutral to depressed and angry. However, she was adequately groomed. The claimant was calm with appropriate and fluent speech. She was oriented. Memory, concentration and attention were all intact. Her thought processes were linear with tight associations and were logical. Judgment and insight were good. She was prescribed Cymbalta (Exhibit 5F, page 27). The negative/normal/intact objective findings are not consistent with the existence of mental problems of a work precluding degree of severity.

In late December 2013 the claimant claimed she was not motivated to do housecleaning, that she had not taken her garbage out for month, and that she had not showered for 2 weeks. However she reported she went to her sister's house for Christmas and reported her mood was better and that she was not so down. Although her affect was flat at times and depressed, her mental status examination was otherwise negative/normal. Memory, concentration and attention were all intact. She was adequately groomed. Thought processes were logical and linear. She was oriented. She was observed to have a normal gait. The claimant was to increase the dose of Cymbalta and start the medication Wellbutrin (Exhibit 5F, pages 20-23). The negative/normal/intact objective findings are not consistent with the existence of mental problems of a work precluding degree of severity.

In late February 2014 the claimant's mood was observed to be sad to neutral. Her mental status examination was otherwise intact/normal. The claimant endorsed positive side effects of the medications with no negative side effects. The dose of the medication Wellbutrin was to be increased (Exhibit 5F, pages 10-12). The treatment notes establish the effectiveness of medication and counseling in reducing or controlling symptoms when used appropriately.

In May 2014 the claimant reported she was doing better with increased motivation. She appeared anxious but her mood was euthymic. Mental status examination findings were otherwise negative/normal/intact. The medication Wellbutrin was stopped and the claimant was to start the medication alprazolam (Exhibit 5F, page 4). The claimant's admissions and good mental status exam findings in May and August 2014 (Exhibit 6F, page 21) are not consistent with disability but are supportive of the functional capacity assigned by the undersigned.

\*\*\*

The claimant maintained at the hearing on August 10, 2015 that she had probably 4 panic attacks per day. However, the medical record does not indicate the claimant persistently sharing that she was having "panic attacks" 4 times per week. In June 2015 the claimant stopped taking Cymbalta, admitted having a clear mind and stated she had started writing again which she enjoyed. She wished to refrain from psychotropic medication other than as needed alproazolam which she took 3 times a week. The claimant denied emotional dysregulation (Exhibit 6F, pages 2-6). The claimant's ability to stop one medication and decrease another, her report of a clear mind and her daily activity of writing which she enjoyed establish continuing resolution of her purported symptoms. These findings are not consistent with impairments of a totally work precluding degree of severity. These findings are supportive of the functional capacity assigned.

*Id.* 31-32.  The ALJ also addressed Fox's mild degenerative disc disease:

A lumbar spine x-ray in November 2014 showed trace spondylolisthesis (Exhibit 6F, page 23). The objective findings are not consistent with a work precluding degree of pain. The claimant's complaints throughout the time in question have been of more minimal and tolerable symptoms (see, e.g., Exhibits 5F, p. 10 – pain 1 on a scale to 10; page 17 – pain 0; 6F, p. 9 – "Do You Currently Have Pain Now:  No"; p. 17 - pain 4; p. 3-- level 4).

\*\*\*

The claimant complained of back and leg pain in August 2015 for which she was to receive physical therapy. She seemed to have reduced strength in her lower extremities. However, there was no loss of range of motion indicated. She complained of numbness but none was observed. Her description of symptoms ("hurts") and lack of other objective findings are not consistent with a severe, work precluding degree of symptoms. Furthermore, there is no indication that the therapy will fail to be effective in resolving the claimant's alleged flare of symptoms.

*Id.*

ALJ Basse noted the evidence was reviewed by a state agency medical consultant doctor who concluded Fox was capable of medium exertional capability, which was confirmed by a second consultant doctor. *Id.* 32.  Those medical opinions were found to "have some support and consistency with some other evidence in the record as a whole." *Id.*  ALJ Basse emphasized, "[h]owever, the doctors did not have available all of the evidence now available to the [ALJ] which supports a more diminished light functional capability." *Id.*  ALJ Basse gave their opinions "such

significant weight as supports" his determination of residual functional capacity for Fox. *Id.*  The ALJ noted their opinions supported "the ultimate finding that [Fox] has not been disabled." *Id.*

In addition, the evidence was reviewed by two state agency psychological consultants. *Id.* ALJ Basse considered the assessments of these non-examining psychologists, giving them some weight, again noting all the evidence was not available to the psychologists. *Id.* 32-33.  As before, the consulting opinions were "given such significant weight as supports the residual functional capacity" determination for Fox and were viewed by the ALJ as supporting "the ultimate finding that [Fox] has not been disabled." *Id.* 33.

Finally, ALJ Basse found that "[m]edications have been effective in reducing or controlling symptoms when used appropriately." *Id.*  It was further noted "[t]here are no side effects of medications credibility established which have lasted for a 12 month continuous period despite attempts at adjustment or substitution, and which further reduce the functional capacity assigned to" Fox. *Id.*

Upon the ALJ's review of the record as a whole, Fox's "allegations concerning the existence, persistence and intensity of symptoms and functional limitations [were] not given full weight or credibility, but only such as reflected in the residual functional capacity" determination. *Id.*  ALJ Basse found factors in favor of Fox were "outweighed by other evidence and inconsistencies in the record." *Id.*  While recognizing the record supports some limitations in Fox's ability to perform work-related activities, the ALJ considered those limitations to be adequately accommodated within the determination. *Id.*

Based upon Fox's residual functional capacity, ALJ Basse then found Fox is capable of returning to and performing past relevant work as a cleaner. *Id.*  In the ALJ's view, this work does not require the performance of work-related activities precluded by Fox's residual functional capacity. *Id.*  ALJ Basse relied upon the vocational expert's opinion that the hypothetical

individual as described during the hearing could perform the job of cleaner as generally performed in the national economy. *Id.*

ALJ Basse explicitly addressed but rejected the argument that Fox's past work was misclassified and meets the definition of a composite job. *Id.* 34.  The ALJ was not persuaded by the report of the vocational rehabilitation counselor/employment specialist, Paula Santagati, and gave greater weight to the oral and written opinions of the vocational expert, Melinda Stahr. *Id.* The ALJ explained:

> It is true that the claimant indicated she "advertised" her business and also hired/fired and "supervised" a couple of employees. But that was only during a brief period of her past relevant work period. The claimant reported she worked as a cleaner from January 1990 to December 2010, and in that approximately 21 year period of time the claimant stated she supervised 2 people for a year. The large part of her work was done solo-she "worked alone most days cleaning private homes" (Exhibit 6E, page 6); these other activities were only incidental. In addition, the undersigned is not persuaded that caring for one's business inventory is a specialized task. The representatives' employment specialist/vocational rehabilitation counselor opines that the claimant had additional duties such as those of a sales-service promoter, DOT number 165.167-010. Those duties include "preparing displays, touring country, making speeches at retail dealers conventions, and calling on individual merchants to advise on ways and means for increasing sales." There is no indication that the claimant's main duties included preparing displays, touring the country and/or giving speeches at retail dealers conventions to promote her business, and calling individual merchants to advise on ways and means for increasing sales.
>
> Although the claimant maintained that she needed to stoop "constantly," the vocational expert at the hearing, Ms. Stahr, noted that the claimant's limitation to frequent stooping was within the scope of the cleaner position as generally performed in the national economy.

*Id.* 35.

ALJ Basse agreed that Fox cannot perform her past relevant work as she had actually performed it, but emphasized it must also be determined whether Fox "is precluded from performing the job as generally performed in the national economy." *Id.*  The ALJ quoted Social Security Ruling 82-61:

a former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

*Id.* The ALJ found Fox's past relevant work as described by the vocational expert "more accurately describes the functional demands and job duties as indicated by the Dictionary of Occupational Titles, and as generally required by employers throughout the economy." *Id.* 35-36. In the view of ALJ Basse, Fox had not met her burden of showing an inability to engage in past relevant work and, therefore, she cannot be found to be disabled as defined by the Social Security Act. *Id.* 36.

## IV. JUDICIAL REVIEW OF DECISION

### A. Standard of Review

When performing judicial review, "[t]he court's task is to determine whether the ALJ's decision 'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quoting *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir. 2008)); *see also*, *e.g.*, *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (court "'will affirm the ALJ's findings if supported by substantial evidence on the record as a whole'") (quoted citations omitted)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed. 2d 842 (1971) (Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126

(1938))).

The "court must consider evidence that supports and detracts from the ALJ's decision," but "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (quoting *Perkins*, 648 F.3d at 897). Thus, "[e]ven if substantial evidence supports a contrary outcome, [the court] may not reverse so long as the Commissioner's decision also is supported by substantial evidence." *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004). Stated in other words, the court

> will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the court] might have reached a different conclusion had [it] been the initial finder of fact.

*Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (internal quotations and citations omitted)). The court may reverse the ALJ's decision if it is based on legal error. *Neal v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005); *Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal citations omitted).

**B. Analysis of Fox's Arguments Before This Court**

In her brief before this Court, Fox makes three primary arguments: (1) ALJ Basse erred by not classifying her prior work owning and operating a cleaning business as a composite job, and she cannot perform that past relevant work; (2) the ALJ erred in not applying Medical Vocational Guidelines Rule 202.06 to her case and finding her disabled; and (3) the ALJ erred in discounting the treating physician's opinion that Fox is limited to part-time work. Dkt. 9 at 14-22. Although not argued explicitly in her brief, Fox also asserts in her complaint that ALJ Basse erred in

assessing her subjective complaints and testimony, and by utilizing a hypothetical question which does not properly describe her limitations. Dkt. 1 ¶¶ 15-16.

After considering each argument as discussed below, and upon an independent review of the record, this Magistrate Judge finds there are insufficient grounds for either reversal of the ALJ's decision or remand for further proceedings. Instead, the decision appears to comply with the requisite law and is supported by substantial evidence in the record as a whole. Although there is some evidence supporting Fox's claims, the ALJ's decision remains within the available zone of choice and, therefore, should not be disturbed by this Court.

### 1.    Assessment of Past Relevant Work

At step four, the ALJ evaluates whether the claimant has the residual functional capacity to perform her past relevant work. *Cuthrell*, 702 F.3d at 1116 (citing 20 C.F.R. §§ 404.1520(a)(4)(iv), (f)); *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (same). If the claimant can perform past relevant work, the claimant is not disabled. *Id.* But if the claimant cannot complete past relevant work, "step five considers the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can do other work. If so, the claimant is not disabled; if not, the claimant is disabled." *Cuthrell*, 702 F.3d at 1116-17 (internal citation omitted). Through step four, "the claimant has the burden of showing that she is disabled. Only after the analysis reaches step five does the burden shift to the Commissioner to show that there are other jobs in the economy that a claimant can perform." *King v. Astrue*, 564 F.3d 978, 979 n. 2 (8th Cir. 2009).

Within the Commissioner's regulations, past relevant work is defined for the claimant as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn how to do it." 20 C.F.R. § 404.1560(b)(1). Accordingly, "[i]n order to be considered past relevant work, a job must have been done within the previous 15 years,

done long enough to learn to do it, and have been substantial gainful activity." *Driskell v. Barnhart*, 182 F.Supp.2d 803, 806 (S.D. Iowa 2002).

When evaluating whether a claimant could perform "her past work, the ALJ [is] required to set forth specifically her limitations and to determine how those limitations affected her residual functional capacity." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir.1997)).  The ALJ also is "required to make 'explicit findings' regarding the physical and mental demands of [the claimant's] past work, and to compare those demands with her residual functional capacity to determine whether she could perform the relevant duties." *Id.*  "Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." *Id.* at 973.

Here, there is no dispute Fox cannot perform her past relevant work as she performed it. A.R. 35.  But ALJ Basse did find Fox capable, based upon her residual functional capacity, "of returning to and performing [her] past relevant work as a cleaner as generally performed in the national economy." *Id.* 33.  Fox insists, however, the ALJ misclassified her past work as a cleaner instead of as a composite job. Dkt. 9 at 16-18.

Fox acknowledges that, normally, reliance on the Dictionary of Occupational Titles ("DOT") is appropriate to determine if a claimant can perform past relevant work as generally performed in the national economy. *Id.* at 16.  She argues, however, if the past relevant work consists of significant elements of two or more occupations, it is a composite job. *Id.*  In turn, she contends that since a composite job has no counterpart in the DOT, it cannot be evaluated at step four by considering work as generally performed in the national economy. *Id.* at 16-17.  In Fox's view, ALJ Basse "improperly disregarded the evidence that [her] cleaning business was in fact a composite job and therefore not listed in the DOT." *Id.* at 17.

Fox emphasizes that her cleaning business involved more than cleaning rooms and halls in commercial establishments. *Id.* She notes "her advertising duties were similar to those of a sales-service promoter, DOT 165.167-010" and "running the business included maintaining her inventory and supervising employees in much the same way that a supervisor, house cleaner would as described at DOT 323.137-010." *Id.* Thus, in her view, limiting the job to just a "cleaner" does not accurately describe her past relevant work with any specificity and is not supported by the evidence in the record as a whole. *Id.*

Fox further argues ALJ Basse improperly classified her job by its least demanding functions. Dkt. 11 at 3. In her view, the ALJ disregarded the more skilled components of her job and classified her work according to the least demanding function – cleaning. *Id.* at 4. She points out that her assertion that past relevant work as an owner/operator of a business is a composite job is supported by the opinions of vocational rehabilitation counselor/employment specialist Paula Santagati. *Id.*

In response, the Commissioner contends the ALJ made a supported finding that Fox could resume her past relevant work as a cleaner. Dkt. 10 at 4. In the Commissioner's view, ALJ Basse thoroughly discussed the evidence and made a supported, legally correct finding that Fox's past relevant work was not a composite job by relying on Fox's description of her job, the DOT and the vocational expert's testimony. *Id.* at 5. The Commissioner emphasizes Fox spent at least 20 years as a cleaner and only supervised two other people for a year. *Id.* at 6. At most, the Commissioner argues, the record shows Fox had two separate jobs, at two separate times, in the cleaning service industry. *Id.*

The Commissioner further contends ALJ Basse properly gave weight to the testimony of the vocational expert, Melinda Stahr, who opined, after personally hearing the evidence including Fox's own description of her past work, that such work included employment as a cleaner as

defined by the DOT. *Id.*  On the other hand, the Commissioner asserts the ALJ properly rejected the opinion of Ms. Santagati, by noting Fox only supervised others for one year, but worked as a cleaner for over 20 years. *Id.* at 6-7.  In addition, while Ms. Santagati's report indicated Fox's past work involved advertising and maintaining an inventory – outside the duties of a cleaner job and comprising duties of a sales-service promoter, the Commissioner asserts the ALJ correctly noted Fox presented no evidence that her main duties included preparing displays, touring the country or giving speeches – those of a sales-service promoter, or that accounting for inventory was a significant element of Fox's cleaning job. *Id.*

Both Fox and the Commissioner cite to Social Security Ruling ("SSR") 82-61, which is a policy statement entitled "Titles II & XVI: Past Relevant Work--the Particular Job or the Occupation As Generally Performed." SSR 82-61, 1982 WL 31387 (S.S.A. 1982).  The purpose of the rule was "[t]o clarify the policy in determining whether a claimant can perform his or her past relevant work, i.e., whether the claimant retains the residual functional capacity (RFC) to perform the physical and mental demands of the kind of work he or she has done in the past." *Id.* SSR 82-61 was quoted and relied upon by ALJ Basse, and provides in part as follows:

> **PERTINENT HISTORY**: The part of the law pertaining to past relevant work provides that as a part of the requirements for a finding of disability a claimant must have a medically determinable physical or mental impairment of such severity that he or she is not able to do his or her previous work. Sections 404.1520(e) and 416.920(e) of the regulations state as follows:
>
> "Your impairment must prevent you from doing past relevant work. If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment, we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. *If you can still do this kind of work*, we will find that you are not disabled." (Underscoring added.)
>
> The regulations further state, in sections 404.1565(a) and 416.965(a), that work experience applies (is relevant) when it was done within the last 15 years, lasted long enough for the person to learn to do it and was substantial gainful activity.

A basic program principle is that a claimant's impairment must be the primary reason for his or her inability to engage in substantial gainful work. This reflects the intent of Congress that there be a clear distinction between disability benefits and unemployment benefits. Congress has also expressed the intent that disability determinations be carried out in as realistic a manner as possible

Three possible tests for determining whether or not a claimant retains the capacity to perform his or her past relevant work are as follows:

1. Whether the claimant retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job, e.g., "delivery job," "packaging job," etc.

Finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable.

While "delivery jobs," or "packaging jobs," etc., may have a common characteristic, they often involve quite different functional demands and duties requiring varying abilities and job knowledge.

2. Whether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it.

Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be "not disabled."

3. Whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy. (The *Dictionary of Occupational Titles* (DOT) descriptions can be relied upon--for jobs that are listed in the DOT -- to define the job as it is *usually* performed in the national economy.) It is understood that some individual jobs may require somewhat more or less exertion than the DOT description.

A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

**POLICY STATEMENT**: Under sections 404.1520(e) and 416.920(e) of the regulations, a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform:

1. The actual functional demands and job duties of a particular past relevant job; *or*

2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

*Id.*   According to the Eighth Circuit, these two tests under SSR 82-61 "are clearly meant to be disjunctive. If the claimant is found to satisfy either test, then a finding of not disabled is appropriate." *Martin v. Sullivan*, 901 F.2d 650, 653 (8th Cir. 1990).

In addition to setting forth the two alternative tests, SSR 82-61 provides further information which in part addresses composite jobs:

> A properly completed SSA-3369-F6, Vocational Report, may be sufficient to furnish information about past work. There may be cases involving significant variations between a claimant's description and the description shown in the DOT. In some instances, an apparent variation may result from an incomplete or inaccurate description of past work. Employer contact or further contact with the claimant, may be necessary to resolve such a conflict. *Also composite jobs have significant elements of two or more occupations and, as such, have no counterpart in the DOT. Such situations will be evaluated according to the particular facts of each individual case.* For those instances where available documentation and vocational resource material are not sufficient to determine how a particular job is usually performed, it may be necessary to utilize the services of a vocational specialist or vocational expert.

SSR 82-61 (emphasis added).

The parties also refer to the Administration's Program Operations Manual System ("POMS").  POMS is "a policy and procedure manual that agency employees use in evaluating eligibility for SSI benefits." *Draper v. Colvin*, 779 F.3d 556, 558 (8th Cir. 2015).  "While these internal rules do not have legal force and do not bind the Commissioner, courts should consider them in their findings." *Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004).  Specifically at issue here is DI 25005.020(B) which provides guidance for "[d]etermining if work was a composite job," stating as follows:

> Composite jobs have significant elements of two or more occupations and as such, have no counterpart in the DOT.

- The claimant's PRW may be a composite job if it takes multiple DOT occupations to locate the main duties of the PRW as described by the claimant.

- If you determine that PRW was a composite job, you must explain why.

- When comparing the claimant's RFC to a composite job as the claimant performed it, find the claimant capable of performing the composite job only if he or she can perform all parts of the job.

- A composite job does not have a DOT counterpart, so do not evaluate it at the part of step 4 considering work "as generally performed in the national economy."

- At step 5 of sequential evaluation, a claimant may be able to use skills he or she gained from a skilled or semiskilled composite job to adjust to other work. See Transferability of Skills Assessment (TSA), DI 25015.017, for instructions on how to assess transferability of skills.

POMS DI 25005.020(B).

Neither Fox nor the Commissioner present Eighth Circuit precedent on the issue of composite jobs. Fox relies primarily on an unpublished Memorandum Opinion and Order, *Garcia v. Colvin*, 2015 WL 8334895 (C.D. Cal. Dec. 8, 2015) and Report and Recommendation, *Lee v. Astrue*, 2012 WL 3637637 (W.D. Wash. July 26, 2012), adopted, 2012 WL 3637635 (W.D. Wash. Aug. 23, 2012). The Commissioner also relied on unpublished district court decisions from other circuits: *McDowell v. Berryhill*, 2017 WL 913950 (S.D. Ind. Feb. 8, 2017), report and recommendation adopted, 2017 WL 897304 (S.D. Ind. Mar. 7, 2017); *Turner v. Comm'r of Soc. Sec.,* 2014 WL 4542975 (M.D. Fla. Sept. 12, 2014); *Driskill v. Colvin*, 2014 WL 3734309 (W.D. Wash. July 28, 2014); *Lybrand v. Astrue*, 2012 WL 762092 (D. S.C. Feb. 8, 2012); *Cooper v. Astrue*, 2010 WL 4448031 (D. Or. Nov. 1, 2010).

In addition to those decisions, this Magistrate Judge has reviewed several other decisions from district courts, including within the Eighth Circuit, addressing the issue of composite jobs. *See, e.g., West v. Berryhill*, 2017 WL 4264126 (E.D. Mo. Sept. 26, 2017); *Tucker v. Berryhill*, 2017 WL 2539750 (D. Me. June 11, 2017); *Lyda v. Colvin*, 221 F.Supp.3d 1254 (D. Col. 2016);

*McAbee v. Colvin*, 2016 WL 3983734 (W.D. Ark. July 25, 2016); *Blackwell v. Colvin*, 2015 WL 4132000 (E.D. Mo. July 8, 2015); *Garcia v. Colvin*, 2013 WL 3321509 (N.D. Ill. June 28, 2013); *Arriaga v. Astrue*, 2012 WL 4105091 (D. Neb. Sept. 18, 2012); *Peterson v. Astrue*, 2010 WL 3219293 (N.D. Ind. Aug. 12, 2010).

Upon reviewing those decisions within the context of the Administration's regulations and rules set forth above, the ALJ's determination that Fox's past relevant work as a cleaner was not a composite job appears to be compliant with the legal requirements and supported by the particular record before this Court.  In that regard, as explicitly provided in SSR 82-61 and repeatedly noted in the court decisions, whether a composite job exists is "evaluated according to the particular facts of each individual case." SSR 82-61.  None of the decisions relied upon by the parties, and reviewed by this Magistrate Judge, analyze the composite job issue under facts similar to those present here.  As such, while review of the case law was instructive, those decisions have minimal persuasive authority.

Based upon the particular record here, it is clear ALJ Basse explicitly addressed but rejected the argument that Fox's past work meets the definition of a composite job. A.R. 34. Contrary to Fox's suggestion that the ALJ "improperly disregarded the evidence," the written decision reflects proper consideration of the evidence and requisite findings by the ALJ as to the physical and mental demands of Fox's past cleaning work in comparison with her residual functional capacity to determine whether she could perform the relevant duties.  Consequently, this case is distinguishable from other court decisions where the ALJ failed to adequately address the issue.

Moreover, the evidence presented to ALJ Basse falls well-short of showing that Fox's cleaning business included "significant elements of two or more occupations" and was therefore a composite job.  In her brief, Fox refers to advertising, supervising and maintaining inventory as

"major aspects" of her business but the underlying record is devoid of evidence supporting the assertion.  In the same way, Fox's argument that cleaning was the "least demanding function" of her business is unsupported and contrary to evidence in the record, including her own testimony. On that point, "[i]t should be kept in mind that it is [claimant's] burden to produce evidence which supports [her] contention that [she] suffers from a severe impairment which prevents [her] from performing [her] past relevant work." *Driskell*, 182 F. Supp. 2d at 808; *see also King*, 564 F.3d at 979 n. 2 ("claimant has the burden of showing that she is disabled" through step four); *Ingram*, 107 F.3d at 604 (Claimant "has the burden of demonstrating that she is unable to perform her previous work.").  Fox did not meet that burden here by showing her cleaning business included "significant" elements of other occupations outside the cleaner job as determined by the ALJ.  In addition to failing to meet this evidentiary burden, Fox has not shown the ALJ erred in the process of assessing of her past relevant work.

It was proper for ALJ Basse to utilize the second test from SSR 82-61 by considering the functional demands and job duties of Fox's past relevant work "as generally required by employers throughout the national economy." SSR 82-61; *see Wagner v. Astrue*, 499 F.3d 842, 854 (8th Cir. 2007) ("Applying relevant precedent to the present case, Wagner's argument that the ALJ erred by looking at the past relevant work as generally required by employers in the national economy necessarily fails, as we approved of such analysis."); *Samons v. Astrue*, 497 F.3d 813, 821 (8th Cir. 2007) ("An ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy."); *Barnett v. Barnhart*, 362 F.3d 1020, 1023 (8th Cir. 2004) ("[T]he ALJ may determine a claimant can perform the claimant's past occupation based on '[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy.'") (quoting *Evans v. Shalala,* 21 F.3d

832, 833-34 (8th Cir.1994) (quoting SSR 82–61)); *Martin*, 901 F.2d at 653 ("If the claimant is found to satisfy either test, then a finding of not disabled is appropriate.").

It was also proper for ALJ Basse to rely on the opinion of the vocational expert who opined, after hearing the evidence including Fox's own description of her past work, that such work included employment as a cleaner as defined by the DOT. *See* A.R. 33-35, 133-34, 377.  SSR 82-61 explicitly provides that "it may be necessary to utilize the services of a vocational specialist or vocational expert." SSR 82-61.  Likewise, "[t]he regulations provide that the ALJ may elicit testimony from a vocational expert in evaluating a claimant's capacity to perform past relevant work." *Wagner*, 499 F.3d at 853 (citing 20 C.F.R. § 404.1560(b)(2) ("We may use the services of vocational experts or vocational specialists . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity.")); *see also Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008) ("At this fourth step, the ALJ, while not required to, may also consider a vocational expert's testimony in determining whether a claimant can perform his past work.").  SSR 82-61 also explicitly notes the DOT "descriptions can be relied upon--for jobs that are listed in the DOT--to define the job as it is usually performed in the national economy." SSR 82-61.  The regulations similarly note resources such as the DOT may be used to help determine whether a claimant can perform past relevant work. 20 C.F.R. § 404.1560(b)(2).  Accordingly, ALJ Basse's reliance on vocational expert testimony and the DOT in assessing Fox's ability to perform past relevant work was compliant with the relevant legal requirements.

Further, the ALJ set forth supported reasons for not accepting the opinion of Ms. Santagati.  It is the ALJ's role to resolve conflicts among expert opinions, and it appears ALJ Basse properly did so in this case. *See Clay v. Barnhart*, 417 F.3d 922, 930 (8th Cir. 2005) (citing *Bentley v. Shalala,* 52 F.3d 784, 785 (8th Cir. 1995)).  Significantly, ALJ Basse considered that Fox had spent at least 20 years as a cleaner but only supervised people for one year. *See* A.R. 35, 316, 320.

The large part of her work was done by herself – she worked alone most days, cleaning private homes. *Id.* The record lacks evidence showing advertising, promoting and maintaining inventory were significant elements of her cleaning business. While Fox lists "advertise, maintain cleaning inventory & vacuums & equipment" in describing her past cleaning business, she did not present evidence expounding on the details of those duties especially as to the time and effort required within the context of the overall business. *See* A.R. 320. Ms. Santagati's reliance on such duties as being significant aspects of Fox's past work is therefore not supported by the evidentiary record.

In sum, there appears to be substantial evidence in the record as a whole supporting the ALJ's determination that Fox is capable of performing past relevant work as a cleaner, as generally performed in the national economy. Fox has not convincingly shown the ALJ erred by not classifying her prior work owning and operating a cleaning business as a composite job. Thus, it is recommended the ALJ's determination at step four that Fox is not disabled as defined by the Social Security Act be affirmed.

### 2. Application of Medical Vocational Guidelines Rule 202.06

Fox contends the ALJ improperly stopped at step four of the sequential evaluation process and was obligated to proceed to step five. Dkt. 9 at 18. She notes that, at this step, medical vocational guidelines apply to determine if she can engage in substantial gainful activity in the national economy. *Id.* Fox argues these guidelines apply even though she has both exertional and non-exertional impairments, because the guidelines direct a conclusion she is disabled based upon strength limitations. *Id.* Specifically, she refers to Medical Vocational Guidelines Rule 202.06 which states that a person of advanced age, who has a high school education, who is limited to light, unskilled work and who has no transferable skills is disabled. *Id.* Fox contends she meets all of these factors and, therefore, applying the guidelines mandates a finding she is disabled. *Id.*

The Commissioner did not address whether Fox is eligible for the application of or meets

the requirements of Rule 202.06.  Rather, because the ALJ determined Fox was not disabled at step four, the Commissioner contends the analysis stops and the process does not proceed to the next step. Dkt. 10 at 10.  According to the Commissioner, the Medical Vocational Guidelines apply only when the claimant cannot perform past relevant work. *Id.*

> The Commissioner's points are persuasive.  As explained by the Eighth Circuit:
>
> The medical-vocational guidelines, or grids, "are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." *McCoy v. Astrue,* 648 F.3d 605, 613 (8th Cir. 2011) (citing 20 C.F.R. Part 404, Subpt. P, App. 2). The grids come into play at step five of the analysis, where "the burden shifts to the Commissioner to show that the claimant has the physical residual capacity to perform a significant number of other jobs in the national economy that are consistent with her impairments and vocational factors such as age, education, and work experience." *Holley v. Massanari,* 253 F.3d 1088, 1093 (8th Cir. 2001).

*Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012).

Neither ALJ Basse nor the prior administrative decisions proceeded beyond the step four analysis as to whether Fox is able to perform past relevant work.  Because the ALJ's determination appears to be supported by substantial evidence in the record as a whole, and not in legal error, there is no need for this Court to proceed to the step five analysis as urged by Fox. *See Masterson v. Barnhart*, 363 F.3d 731, 740 (8th Cir. 2004) ("[B]ecause we agree that Masterson could perform her previous job as a property manager at the light exertional level, our analysis ends at step four of the sequential evaluation."); *Lewis v. Barnhart*, 353 F.3d 642, 648 (8th Cir. 2003) ("Once we have found that there is substantial evidence on the record as a whole to support the ALJ's decision concerning a claimant's disability, the five-step analysis need go no further.").

## 2.  Assessment of Treating Physician's Opinion

Fox argues the ALJ improperly gave no weight to her treating physician's opinion that Fox could not work full time. Dkt. 9 at 19.  In her view, this opinion is supported by the record and is to be given great weight. *Id.* at 20.  To the extent her treating physician's opinion was not consistent

with a subsequent opinion, Fox contends the ALJ failed to properly develop the record to allow the opinion to be clarified. *Id.* at 21. The Commissioner did not respond to this argument in her responsive brief.

In the view of this Magistrate Judge, the ALJ's assessment of Fox's treating physician's opinions is within the available zone of choice under the governing principles. "A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see also, e.g., Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017); *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). Indeed, "[o]pinions of treating physicians typically are entitled to at least substantial weight, but may be given limited weight if they are conclusory or inconsistent with the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016). Good reason for assigning lesser weight to the opinion of a treating source also "exists where 'the treating physician's opinions are themselves inconsistent.'" *Chesser*, 858 F.3d at 1164 (quoting *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996)). Also, "an ALJ need not give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that ALJ does not find credible." *Vance*, 860 F.3d at 1120.

Here, ALJ Basse discounted Fox's treating physician's opinions due to inconsistencies in the record and the diminished credibility of Fox's subjective complaints. In addition to the internal inconsistency in Dr. Countryman's notes as to whether Fox could work full time or not, ALJ Basse found Dr. Countryman's opinion "relies in part upon the claimant's allegations concerning the existence, persistence and intensity of symptoms and functional limitations, which the record as a whole and inconsistencies establish are not entitled to full weight or credibility." A.R. 30. Further, ALJ Basse did give Fox's treating physician's opinions a "good deal of weight" as they relate to Fox's inability to perform her past work as a sales associate/stocker, the need for Fox to

avoid stress at work to help alleviate Fox's colitis and intestinal problems, and that Fox retains the functional ability to perform other work. *Id*.

This assessment of the treating physician's opinions by ALJ Basse is supported by substantial evidence in the record as a whole. As set forth in the medical records, Dr. Countryman told Fox in late October of 2012, "she needed to make a decision regarding her job" and "*recommended* [she] turn in her resignation and get a non-irritating, non-anxiety producing part-time job" with low volume and stress. A.R. 399 (emphasis added). The medical note does not indicate Dr. Countryman limited or restricted Fox to part-time work. Indeed, the subsequent "to whom it may concern" note issued by Dr. Countryman indicated Fox "must only work 8 hour days / 5 day work week." *Id.* 400. Such evidence undermines and is inconsistent with Fox's claim she is limited to only part-time work. Fox has not convincingly shown the ALJ's assessment of her treating physician's opinions, or the alleged failure to further develop the record, was in legal error and requires either reversal or remand.

### 3.   Assessment of Fox's Subjective Complaints and Testimony

Fox asserts in her Complaint that ALJ Basse failed to give good reasons for discounting her testimony and improperly rejected her subjective allegations. Dkt. 1 ¶¶ 11, 15. She did not, however, expound upon those issues in her brief. Nevertheless, to provide a complete report and recommendation, those issues have been considered and are addressed as follows.

Factors for evaluating a claimant's subjective complaints were set forth by the Eighth Circuit in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

> [T]he ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence.

*Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (internal citations and quotations omitted); *see also Wright v. Colvin*, 789 F.3d 847, 853-54 (8th Cir. 2015) (applying *Polaski* factors).  "The ALJ is not required to discuss each *Polaski* factor as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints." *Jones*, 619 F.3d at 975; *see also Ford*, 518 F.3d at 982 ("The ALJ had to consider these matters, but did not have to discuss each one of them in relation to [the claimant].")  As further explained by the Eighth Circuit,

> [a]n ALJ may discredit any subjective allegations that cannot reasonably be expected to flow from an established, medically determinable impairment. 20 C.F.R. § 404.1529(b). Once a claimant has demonstrated the existence of an impairment that could reasonably be expected to produce the alleged symptoms, the question becomes whether the claimant's subjective allegations regarding the extent of her symptoms are credible. *See id.* §§ 404.1528, 404.1545(e). The ALJ must consider the consistency of the evidence, and consider information provided by the claimant, her doctors, and others with knowledge of her circumstances. *Id.* § 404.1529(c); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

*Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016).

"'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *see also Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) ("Assessing and resolving credibility is a matter properly within the purview of the ALJ.").  Thus, courts "'defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Mabry v. Colvin*, 815 F.3d 386, 389 (8th Cir. 2016) (quoting *Johnson v. Colvin*, 788 F.3d 870, 872 (8th Cir. 2015) (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006))).  The ALJ is required, however, to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford,* 518 F.3d at 982 (quoting *Lewis,* 353 F.3d at 647); *Guilliams v. Barnhart,* 393 F.3d 798, 802 (8th Cir. 2005) (same).

Here, the credibility assessments of ALJ Basse appear to be supported by good reasons and

substantial evidence.  The ALJ explicitly noted the appropriate standards and factors to consider when assessing a claimant's credibility, and then determined Fox's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." A.R. 29-30.  In doing so, ALJ Basse detailed various aspects in the record as to Fox's background and medical treatments, including prior receipt of unemployment compensation, inconsistencies concerning her reports of issues with incontinence, and lack of a persistent search for treatment. *Id.* 32.  Additionally, relating to her mental status, the ALJ found notes in the medical records of "negative/normal/intact objective findings" are not consistent with mental problems of a severity that would preclude work. *Id.* 32-33.

As such, the ALJ's assessment of Fox's subjective complaints was in accordance with the requisite standards.  According to the Eighth Circuit, "'[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole.'" *Igo*, 839 F.3d at 731 (quoting *Pearsall*, 274 F.3d at 1218 (citing *Polaski,* 739 F.2d at 1322)); *see also Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) ("The ALJ may properly discount the claimant's testimony where it is inconsistent with the record."); *Ford*, 518 F.3d at 982 (ALJ permitted to discount claimant's complaints if inconsistent with the evidence as a whole).  Consequently, the Court should defer to ALJ Basse's credibility determinations in this case.

### 4.  Error in Hypothetical Question

Fox asserts in her Complaint that the hypothetical question posed by ALJ Basse to the vocational expert does not adequately describe Fox's limitations. Dkt. 1 ¶ 16.  Again, she did not expound upon those issues in her brief.  Nevertheless, to provide a complete report and recommendation, the issue has been considered and is addressed as follows.

"A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" *Guilliams*, 393 F.3d at 804

(quoting *Davis v. Apfel,* 239 F.3d 962, 966 (8th Cir. 2001)); *see also Harwood v. Apfel*, 186 F.3d 1039, 1044 (8th Cir. 1999) ("'A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant.'" (quoting *Hutton v. Apfel,* 175 F.3d 651, 656 (8th Cir. 1999)).  As further explained by the Eighth Circuit,

> [t]estimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments.

*Renstrom*, 680 F.3d at 1067 (quoting *Jones*, 619 F.3d at 972) (internal quotation marks and citation omitted)).  Thus, "[t]estimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007).

On the other hand, an "'ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoted citation omitted); *see also Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) ("The hypothetical question need only include those impairments and limitations found credible by the ALJ.").  Stated otherwise, "the hypothetical question to the vocational expert [does] not need to incorporate the additional limitations the ALJ had properly disregarded." *Renstrom*, 680 F.3d at 1067 (citing *Wildman v. Astrue,* 596 F.3d 959, 969 (8th Cir. 2010) ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded.")); *see also, e.g.*, *Guilliams*, 393 F.3d at 804 ("Discredited complaints of pain . . . are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them."); *Haynes v. Shalala,* 26 F.3d 812, 815 (8th Cir. 1994) ("A hypothetical question need only include those impairments that the ALJ accepts as true.").

In this Magistrate Judge's opinion, the hypothetical question posed to the vocational expert

by ALJ Basse was within these requisite standards.  The written decision reflects the hypothetical included limitations the ALJ found were credible and substantially supported by the record as a whole, but excluded those limitations disregarded as not credible.  Fox has not shown a sufficient reason for either reversal or remand due to the hypothetical question posed in this case.

## V.   RECOMMENDATION

After a thorough examination of the Administrative Record and in accordance with the standards of review the Court must follow, this Magistrate Judge concludes that the ALJ's determination that Susan Fox is not disabled under the Social Security Act complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Accordingly, it is recommended that the final decision denying disability insurance benefits to Ms. Fox be affirmed and judgment be entered in favor of defendant Commissioner of the Social Security Administration.

Pursuant to Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72A, the parties shall have until February 26, 2018, to file specific, written objections to this report and recommendation.

Dated February 12, 2018.

STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE